UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID R. JOHNSON,                          )
                                           )
            Plaintiff,                     )        Case No. 11 C 3989
                                           )
v.                                         )        Magistrate Judge Sidney I. Schenkier
                                           )
MICHAEL ASTRUE,                            )
Commissioner of Social Security,           )
                                           )
            Defendant.                     )

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, David R. Johnson, pursuant to 42 U.S.C. § 405(g),

seeks review of the final decision by the Commissioner of the Social Security Administration

("SSA") denying his application for social security benefits. On August 27, 2007, Mr. Johnson

applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"),

alleging he became unable to work on the onset date of February 28, 2007, because he is disabled

based on the following impairments: herniated and degenerated discs and arthritis in his spine;

severed tendons, bone spurs, and torn rotator cuffs in both shoulders; and mid-back, hip, left leg,

shoulder, and hand pain (R. 18, 45-46, 155, 164). After his disability applications were denied

initially and upon reconsideration (R. 1, 68), Mr. Johnson sought and received a hearing before an

administrative law judge ("ALJ"), which took place on September 23, 2009 (R. 34). On October 23,

2009, the ALJ issued a written decision denying benefits and finding that Mr. Johnson was not

disabled under the Social Security Act ("the Act") (R. 18-29). The Appeals Council denied review

---

[1]On December 1, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was
referred to this Court for all further proceedings, including the entry of final judgment (doc. # 10).

(R. 1-6), making the ALJ's decision the Commissioner's final decision. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

Mr. Johnson has filed a motion asking us to reverse and/or remand the ALJ's decision (doc. # 12). The Commissioner filed a response asking us to affirm the decision (doc. # 17). For the following reasons, we grant plaintiff's motion for remand.

## I.

### A.

Mr. Johnson was born on October 2, 1964 (R. 37). He has a twelfth grade-level education and speaks English fluently (R. 28, 41). From 1991 to 2007, he worked as a carpenter performing skilled and semi-skilled work, including roofing and window installation and repair (R. 58-59, 165). These jobs required lifting 20 to 200 pounds, reading blueprints and sketches, making measurements, using hand tools, working in teams, following plans, meeting deadlines, and assembling materials according to specifications (R. 43, 59). In December 2008 – after his alleged disability onset date – Mr. Johnson worked for a construction company for 3 to 4 months, about 20 hours per week, doing trim work on a house (R. 41-42). This work involved walking, standing, kneeling, and lifting about ten pounds (*Id.*).

### B.

For three to four months in 1999, Mr. Johnson saw Dr. Orest Horodysky, an internist, after falling at work (R. 55-56). A blood test found that Mr. Johnson was positive for the antigen HLA-B27, indicating he might have Reiter's Disease (reactive arthritis) or spinal arthritis, and Dr. Horodysky prescribed him Celebrex (R. 55-56, 230). No subsequent physician diagnosed Mr. Johnson with either affliction, and Mr. Johnson did not take the medication for long (R. 55).

Beginning in 2005, Mr. Johnson periodically saw Dr. Cynthia Goldman, an internist, for general checkups and medication to manage various conditions irrelevant to this appeal (R. 243-47). During a routine examination on November 11, 2006, Dr. Goldman reported that Mr. Johnson had a normal musculoskeletal inspection: his arms and legs had normal strength, tone, and stability with no misalignments or tenderness (R. 244). At that time, Mr. Johnson had no complaints of muscle weakness or loss of sensation (R. 243). He had no difficulties with his gait (*Id.*).

On February 20, 2007, Mr. Johnson fell while shopping at Home Depot and went to the emergency room at Provena St. Joseph Medical Center (R. 231, 241). Mr. Johnson was diagnosed with wrist sprain, back pain, and right shoulder strain and prescribed Dolobid (an anti-inflammatory), Flexeril (a muscle relaxant), and Motrin (*Id.*). He was instructed to rest and ice his sprain (*Id.*). He followed up with Dr. Goldman on February 22, 2007, who found that Mr. Johnson had bruising and pain at his shoulder but normal x-rays (R. 241). Dr. Goldman diagnosed Mr. Johnson with shoulder strain and recommended he take off work for one week and continue taking over-the-counter medications (*Id.*). Mr. Johnson next saw Dr. Goldman on March 14, 2007, for a bout of bronchitis, but he did not complain of any shoulder problems during that visit (R. 240).

Mr. Johnson began treatment with chiropractor Dr. John Kravarik on February 28, 2007 to address restricted range of motion in his lumbar spine (R. 276).[2] Dr. Kravarik treated Mr. Johnson several times each month from March to September 2007, using a variety of techniques including electric muscle stimulation, heat, and intersegmental traction (R. 251-276). In June 2007, Dr.

---

[2]We note that a graduate of a chiropractic school receives the degree of "Doctor of Chiropractic," and in the United States is entitled to use the title "doctor." WIKIPEDIA, THE FREE ENCYCLOPEDIA, CHIROPRACTIC EDUCATION, www.en.wikipedia.org/wiki/Chiropractic (accessed 08/01/12). We thus use the title "Dr." when referring to Dr. Kravarik. By using that title, we do not resolve any dispute that the parties may have as to whether a chiropractor is "an acceptable medical source" for purposes of proceedings under the Social Security Act.

Kravarik ordered MRIs of Mr. Johnson's lumbar spine and shoulders because of continued pain (R. 257, 267, 306-09).

The MRI of Mr. Johnson's left shoulder revealed a torn rotator cuff muscle and mild degeneration of the joint between the shoulder blade and collarbone (AC joint) with a small bone spur (R. 274). The MRI of his right shoulder also showed a rotator cuff tear, and the findings suggested impingement with a bone spur (R. 273). The MRI of Mr. Johnson's lumbar spine revealed multi-level degenerative changes (R. 268). There was mild to moderate disk degeneration between L4-L5 with some dehydration but normal disk height and moderate facet arthrosis (*Id.*). Between L5-S1, there was severe degeneration and dehydration of the disks with decreased disk height and moderate facet arthrosis (*Id.*). After reviewing the MRIs, Dr. Kravarik referred Mr. Johnson to Dr. Mukund Komanduri, an orthopedic surgeon, for surgical consultation (R. 278).

On July 11, 2007, Mr. Johnson met with Dr. Komanduri for an evaluation (R. 278). Mr. Johnson complained of substantial pain in both shoulders lasting several months, with greater pain in his left shoulder than the right (*Id.*). Mr. Johnson told Dr. Komanduri that his shoulder pain was potentially a year old, but he was uncertain when it started and could not identify any specific trauma that caused it (*Id.*). He also told Dr. Komanduri he could no longer work as a carpenter because the pain was increasing and had become intolerable (*Id.*).

Dr. Komanduri reviewed the MRIs and confirmed that Mr. Johnson had "bilateral rotator cuff tears with AC joint arthritis and chronic impingement" (R. 279). A physical examination revealed severe bilateral impingement with reduced rotator cuff strength and AC joint arthritis in both shoulders with positive crossover test and tenderness to palpation (*Id.*). However, Dr. Komanduri found that Mr. Johnson had no evidence for labral tears and no evidence of instability (R. 279). As

4

an alternative to surgery, Dr. Komanduri presented the options of more physical therapy, anti-inflammatories, and activity modification (*Id.*). While Mr. Johnson "underst[ood] that further conservative care [might] help him," he felt his pain was "unbearable" and elected to have surgery on his left shoulder (*Id.*). Mr. Johnson also wished to "address" his right shoulder, but Dr. Komanduri advised him that it would not be "reasonable" to do so any sooner than at least eight weeks after the left shoulder procedure (*Id.*). Mr. Johnson expressed concern that his insurance would run out, and Dr. Komanduri told him to "COBRA[] his insurance so that he [would] have adequate postoperative physical therapy" (*Id.*).

On July 17, 2007, Mr. Johnson visited Dr. Goldman to obtain clearance for the surgery (R. 238). Dr. Goldman noted that Mr. Johnson had clicking and pain in both arms, and she medically cleared him for surgery (R. 239). At that time, Mr. Johnson was not taking any medications and had a normal physical examination (*Id.*). Dr. Komanduri performed the surgery – arthroscopy subacromial decompression and mini open rotator cuff repair on his left shoulder – on July 24, 2007 (R. 248).

Mr. Johnson followed up on his surgery every month with Dr. Komanduri and continued his chiropractic appointments with Dr. Kravarik (R. 288-93). On August 10, 2007, Dr. Komanduri reported that Mr. Johnson was "stable and doing well" (R. 288). On September 7, 2007, Dr. Kravarik noted that Mr. Johnson's condition was "much improved": no pain, but continued decreased range of motion of the cervical and lumbar spine (R. 251). Three days later, Dr. Kravarik noted that Mr. Johnson had improved even further (*Id.*). Although Mr. Johnson still had some decreased range of motion, his range of motion increased in his left shoulder, and he had negative Kemp's and straight leg raise testing (*Id.*).

5

On September 19, 2007, Dr. Komanduri noted that Mr. Johnson was about "20% improved overall" and was making "good progress in therapy" with "good gains in range of motion," though he needed to work on strengthening (R. 289). On October 22, 2007, Dr. Komanduri reported to Dr. Kravarik that Mr. Johnson was doing "fairly well," though he had some pain directly over the rotator cuff incision (R. 290). Mr. Johnson also had tenderness over the acromial insertion, but Dr. Komanduri believed that it would subside in time and recommended deep tissue massage and continued rotator cuff rehabilitation (*Id.*).

On November 16, 2007, Mr. Johnson complained to Dr. Komanduri of pain in both legs (R. 291). Dr. Komanduri ordered an MRI, noting a "defect" in the left Achilles tendon that may have been a chronic injury, though Dr. Komanduri was unclear when it occurred (*Id.*). Mr. Johnson's left shoulder, however, was rehabilitating well (*Id.*). The MRI revealed some tendonitis inflammation but no obvious rupture (R. 292). By November 26, 2007, Mr. Johnson's Achilles tendons were feeling better and palpation did not suggest any large defects (*Id.*).

By December 26, 2007, Dr. Komanduri found that Mr. Johnson had made "decent progress" and recommended a "little more therapy" with the expectation of finishing left shoulder rehabilitation within one month (R. 293).

## C.

On November 28, 2007, SSA medical consultant Dr. Michael Nenaber completed a Residual Functional Capacity ("RFC") Assessment for Mr. Johnson (R. 280-87). Dr. Nenaber described Mr. Johnson's primary diagnosis as "[status post] subacromial decompression surgery" and a secondary diagnosis of "mini open rotator cuff repa[i]r" (R. 280). Dr. Nenaber opined that Mr. Johnson could occasionally carry up to 20 pounds, frequently lift ten pounds, and stand and/or walk for a total of

6

six hours in an eight-hour workday, and push and/or pull for an unlimited time frame (R. 281). Dr. Nenaber further determined that Mr. Johnson was capable of occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling, but never capable of climbing ladders, ropes, or scaffolds (R. 282). He concluded his report by noting that Mr. Johnson was "healing well" and just needed to "improve strength" according to his doctor (R. 287).

On February 5, 2008, Dr. Komanduri completed a Bureau of Disability Determination Services ("DDS") form (R. 298-300). Dr. Komanduri reported that Mr. Johnson did not have arthritis and did not need any assistive devices to walk, nor did he suffer from depression because of his pain (R. 298). Dr. Komanduri indicated on a diagram that Mr. Johnson's left shoulder mobility was only slightly diminished (R. 300).

Two days later, on February 7, 2008, Dr. Kravarik also completed a DDS form (R. 303-05). He reported that Mr. Johnson has had several problems in his back, including pain, tenderness, stiffness, redness, warmth, and swelling in his lumbar spine and cervical spine for more than 10 years (*Id.*). He reported that Mr. Johnson was unable to perform shoulder-level or overhead reaching with either arm, and that his gait was guarded, slow, and antalgic (pain-avoiding) (*Id.*). Dr. Kravarik further stated that Mr. Johnson could stand for only one hour at a time, before needing to alternate positions for five to ten minutes to relieve discomfort (*Id.*). Dr. Kravarik recommended chiropractic care with rehabilitation, but noted that Mr. Johnson "will always have problems due to extensive degeneration in [his] spine" (R. 305).

On February 25, 2008, SSA medical consultant Dr. Calixto Aquino affirmed Dr. Nenaber's November 28, 2007 RFC Assessment (R. 316). Dr. Aquino noted that Mr. Johnson was "credible,"

and that his "condition" (undefined) is "improving and should be better by [July 2008]" (*Id.*). Dr. Aquino further noted that Mr. Johnson had "some tendonitis but no rupture" (*Id.*).

The next month, Dr. Kravarik referred Mr. Johnson to Dr. Michel Malek, a neurological surgeon, for his chronic lower back pain along with leg numbness and neck and upper back pain (R. 317). On March 19, 2008, Mr. Johnson met with Dr. Malek and complained of constant lower back pain that had worsened over the previous ten years (*Id.*). Dr. Malek determined that Mr. Johnson had hypoactive reflexes but no acute distress; his sensation was "unremarkable" and straight leg raising and hip pathology tests were negative (R. 318). Dr. Malek reviewed Mr. Johnson's MRIs from 2007 and diagnosed him with chronic lumbar radiculopathy (herniated disk), recommending pain medication, muscle relaxants, and anti-inflammatories (R. 318-19). Dr. Malek further recommended epidural injections, smoking cessation, continued chiropractic treatment, and less physically demanding work (R. 319). Dr. Malek concluded that if none of these solutions were effective, Mr. Johnson would need to have back surgery (an L4-S1 fusion) (R. 318).

From March 2008 through September 2008, Mr. Johnson received three rounds of epidural steroid injections and bilateral L4-L5 and L5-S1 facet injections from Dr. Malek (R. 325-40). On June 9, 2008, Dr. Malek reported that Mr. Johnson's first epidural injection on March 31, 2008 provided "significant relief for 1½ months," though the pain was returning (R. 330). Dr. Malek opined that it was "not unreasonable" to proceed with the second and third epidural injections (*Id.*).[3]

---

[3] Dr. Malek noted on this report that Mr. Johnson had undergone "shoulder repair with rotator cuff repair" sometime after the first injection (R. 330). This is the only reference in the medical record to additional shoulder surgery (presumably on the right shoulder). Mr. Johnson's testimony at his hearing suggests that Dr. Komanduri performed this second surgery (R. 43).

Mr. Johnson received his second injection on July 14, 2008 (R. 336). In his follow-up report

on September 17, 2008, Dr. Malek noted that the epidural provided "good relief" of Mr. Johnson's

symptoms, though the pain was returning yet again (R. 338). Dr. Malek recommended proceeding

with the third injection before "considering any more intervention such as surgery" (*Id.*). Mr.

Johnson received his third injection on September 26, 2008 (R. 339). The record does not contain

a follow-up report from Dr. Malek about this procedure.

### D.

A hearing was held before ALJ Sherry Thompson on September 23, 2009 (R. 34). Mr.

Johnson and Vocational Expert ("VE") Grace Giamporte testified at the hearing (R. 39).[4]

Mr. Johnson testified that he had constant back pain, which often triggered hip and left calf

pain (R. 45). Mr. Johnson can reach in front of himself, but not above his head, because his legs

become numb (R. 48). He can walk for 15 minutes before his hips start hurting, and he can sit for

15-20 minutes before he must stand for 10-15 minutes to relieve his back (R. 46). Damp weather

makes him feel stiff and intensifies his discomfort (R. 45-46). Mr. Johnson also testified that he has

lost sensation in several fingertips, though his hands were otherwise fine, and he never complained

to his treating physicians about the condition (R. 48, 56).

Despite continued pain, Mr. Johnson testified he was not receiving medical treatment or

taking any medication other than over-the-counter Aleve. (R. 43, 47). He recalled that the last time

---

[4]At the start of the hearing, Mr. Johnson's attorney stated that Mr. Johnson's 1999 blood test found the presence of HOAA 27 (R. 40). HOAA 27 is a sign of ankylosing spondylitis: a long-term disease that causes inflammation of the joints between the spinal bones and between the spine and pelvis, and eventually causes the affected spinal bones to join together. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001457/. Mr. Johnson's attorney stated that the presence of HOAA 27 may require a listing for inflammatory arthritis and/or review of Mr. Johnson's problems by a rheumatologist (*Id.*). The record, however, does not contain any other discussion of the effect of the presence of HOAA 27.

he took prescription pain medication was after having his shoulder operation (R. 47). Mr. Johnson testified that his insurance ran out around October 2008 when he was receiving physical therapy after surgery on his right shoulder (R. 44).

Mr. Johnson takes care of his own personal hygiene, including showering, shaving, dressing, and brushing his teeth (R. 49). During a typical day, Mr. Johnson cooks breakfast and dinner, washes the dishes, watches television, and alternates between lying down, sitting, and pacing to manage his pain (R. 53). He estimates that he spends about six hours lying down each day (R. 54). Because of his pain, he has difficulty sleeping (R. 49). Mr. Johnson occasionally shops with his son for 20-30 minutes, and he attends Elks meetings once a month (R. 50-51). He can no longer pursue his former hobbies of boating and water-skiing (R. 54).

The VE began her testimony by classifying Mr. Johnson's past relevant work (R. 58-59). She noted that while the Department of Labor classifies Mr. Johnson's former occupations of carpenter, roofer, and window repairer and installer as involving a "medium" level of exertion, Mr. Johnson actually performed "all the past work at the heavy level" (R. 59). The VE opined that Mr. Johnson's former work was "very demanding . . . physically" (*Id.*).

The ALJ asked the VE to consider a hypothetical individual with the same "age, education, and work experience" as Mr. Johnson, who possessed the RFC to "perform the full functional range of light work" and "all postural activities occasionally" but could not reach overhead (R. 60). When asked whether such an individual could perform any of Mr. Johnson's prior relevant work, the VE answered "no" (*Id.*).

The ALJ then asked the VE to testify about any semi-skilled occupations at the "light level" that such a hypothetical person could perform (*Id.*). The VE identified building supplies sales clerk,

wood products inspector, and order filler jobs that existed in significant numbers in the regional

economy (R. 60-61). The ALJ then asked the VE to testify about unskilled jobs available to such

a hypothetical person (R. 61). The VE identified weigher, clerical stock checker, and unskilled wood

inspector (*Id.*). Finally, the ALJ asked the VE to identify any sedentary jobs for an individual who

must alternate between sitting for 30 minutes and standing for 10 (R. 61). The VE opined that no

such jobs existed, as having to walk for 10 minutes after sitting for 30 would "presumably take[] the

person off task" (R. 62).

Mr. Johnson's attorney asked the VE if someone who needed to "lie down for an unscheduled

period, for an hour or for a day" was employable (R. 62). The VE opined that such behavior would

"be an adverse factor to performing full-time competitive work on a sustained basis" (*Id.*).

At the end of the hearing, the ALJ left the record open for 21 days in case Mr. Johnson

"need[ed] to see a rheumatologist" because of the results of his 1999 blood test (R. 62-63). The

record does not contain any such medical documents.

### E.

The ALJ issued a written decision on October 23, 2009 denying benefits and finding that Mr.

Johnson was not disabled under the Social Security Act (the "Act") (R. 18-29). The ALJ applied the

five-step sequential analysis required by 20 C.F.R. § 404.1520(a) (R. 19-20).

At Step 1, the ALJ found that Mr. Johnson's last insured date was December 31, 2012, and

that Mr. Johnson had not engaged in substantial gainful activity since his alleged disability onset date

of February 28, 2007 (R. 20). Although Mr. Johnson worked part time for three to four months after

his alleged onset date, the ALJ determined that this activity was an "unsuccessful work attempt" for

purposes of the disability analysis (*Id.*).

11

At Step 2, the ALJ found that Mr. Johnson's back and spine disorders and status post rotator cuff tear surgery constituted severe impairments (R. 21). The ALJ determined that Mr. Johnson's other alleged impairments were not severe, including tendonitis inflammation of the ankles, high cholesterol, depression, and anxiety (*Id.*).

At Step 3, the ALJ concluded that Mr. Johnson's impairments did not meet or medically equal a listed impairment (R. 21). The ALJ determined that Mr. Johnson had the RFC to perform light work "limited to occasionally performing activities requiring balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, or scaffolds," though Mr. Johnson "should never reach overhead with either arm" (R. 22).

In making this determination, the ALJ found that although Mr. Johnson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective medical findings and evidence" (R. 23). Specifically, the ALJ noted that despite Mr. Johnson's allegations of disabling pain, he was not receiving any medical treatment or taking medication other than over-the-counter Aleve at the time of the hearing (R. 26).

On the issue of Mr. Johnson's left shoulder problems, the ALJ found that his treatment for those problems were "essentially routine and conservative in nature" and "generally. . . successful in controlling his symptoms" (R. 26). The ALJ acknowledged that Mr. Johnson's left shoulder surgery "certainly suggest[ed]" that his symptoms were genuine, but the ALJ found this conclusion was offset by two facts: *first*, the surgery was "generally successful in relieving [Mr. Johnson's]

symptoms well within 12 months of the alleged onset date," and, *second*, Drs. Kravarik and Komanduri reported good improvement within 12 months of Mr. Johnson's alleged onset date (*Id.*).

As to Mr. Johnson's right shoulder, the ALJ found that Mr. Johnson only required conservative treatment to manage his symptoms (R. 26). The ALJ rejected Mr. Johnson's testimony that he underwent right shoulder surgery and rehabilitation, stating that there was no evidence in the medical record to support "surgical or post surgical treatment records for [Mr. Johnson's] right shoulder/arm" (*Id.*). In making that finding, the ALJ did not mention Dr. Malek's note that Mr. Johnson "ha[d] shoulder repair with rotator cuff repair" sometime between March 31, 2008 and a follow-up visit on June 9, 2008 (R. 328, 330).

Furthermore, the ALJ found that Mr. Johnson's brief period of work after his onset date "suggests that he had experienced some improvement in his condition" of his shoulders (R. 26). The ALJ added that Mr. Johnson's treating doctors did not place restrictions on him that suggested "totally disabling symptoms" (*Id.*). Finally, the ALJ pointed out that after December 2007, Mr. Johnson's treatment record focused on his back pain rather than shoulder symptoms, suggesting that his shoulders had improved (*Id.*).

As for Mr. Johnson's back and spinal problems, the ALJ found that Mr. Johnson "has had only conservative treatment and not required surgical management," and responded well to chiropractic treatment and epidural and facet injections on March 31, July 14, and September 26, 2008 (R. 26). The ALJ gave "little weight" to Dr. Kravarik's medical source statement reporting that Mr. Johnson had chronic lumbar and cervical spine pain, could not stand or sit for more than an hour at a time without alternating positions, and "would always have the problems due to extensive degeneration of the spine" (R. 25). The ALJ stated that she gave little weight to Dr. Kravarik's

13

opinion for two reasons. *First*, as a chiropractor, Dr. Kravarik was not an "acceptable medical source" to establish an impairment under 20 C.F.R. § 404.1513 (*Id.*). *Second*, while the ALJ acknowledged that evidence from a chiropractor "can be used to show the severity of an impairment and how it affects one's ability to work," the ALJ found that Dr. Kravarik's opinion was "not supported by his own clinical findings" or the findings of Drs. Komanduri and Malek (*Id.*).

In contrast, the ALJ gave "great weight" to the State agency medical consultants who found that Mr. Johnson retained the RFC to perform a restricted range of light work (R. 25-26). The ALJ noted that the consultants' assessments were "generally consistent with the medical evidence of record, including evidence submitted after their review" and did not conflict with "medical opinions from acceptable sources in the record" (R. 26).

Finally, the ALJ noted that Mr. Johnson still had "fairly significant activities of daily living" that undermined his claims of disabling symptoms (R. 27). The ALJ pointed out that Mr. Johnson could lift a gallon of milk and a six-pack of soda, occasionally went shopping, and performed part-time work in December 2008, long after his alleged disability onset date (*Id.*).

At Step 4, the ALJ found that Mr. Johnson is unable to perform any of his past relevant work (R. 27). But at Step 5, the ALJ determined that Mr. Johnson's age, education, and skills from past work allow him to perform jobs that exist in significant numbers in the national economy, such as building supplies sales clerk, wood products inspector, and order filler, and thus found Mr. Johnson not disabled (R. 28).

## II.

We begin our analysis by laying out the governing legal standards. To receive DIB and SSI under the Act, a claimant must show that he has a disability, defined as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ must ask whether: (1) the claimant has engaged in any "substantially gainful activity" since the alleged disability onset date; (2) his impairment or combination of impairments is severe; (3) his impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) his RFC prevents him from performing past relevant work; and (5) his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). In this sequential analysis, the claimant carries the burden of proof in Steps 1 through 4, and the burden shifts to the Commissioner in Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

We will uphold an ALJ's decision if it is supported by "substantial evidence," defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotations omitted). An ALJ must construct a "logical bridge" between the evidence in the record and her conclusions. *Id.* We will not uphold an ALJ's decision that mischaracterizes the medical evidence or fails to mention significant evidence that supports the plaintiff's claim. *Golembiewski v. Barnhart*, 322 F.3d 912, 916-17 (7th Cir. 2003); *see also Parker v. Astrue*, 597 F.3d 920-21 (7th Cir. 2010).

### III.

Mr. Johnson argues that the ALJ erred by: (1) giving little weight to the opinion of Dr. Kravarik; (2) discounting Mr. Johnson's credibility as to his pain and functional limitations; and (3) failing to order rheumatological and mental examinations (Pl.'s Mem. at 1). While plaintiff is

less clear about this than is advisable, all of these arguments at bottom challenge the ALJ's finding at Step 3 that Mr. Johnson possesses an RFC that allows him to perform light work with certain limitations.

For the reasons that follow, we conclude that because the ALJ committed certain errors in arriving at the RFC, we cannot say that his RFC determination is supported by substantial evidence.[5]

## A.

Mr. Johnson argues that the ALJ improperly discounted the assessment by Dr. Kravarik, his chiropractor, of Mr. Johnson's impairment of his right shoulder, left shoulder, and back (Pl.'s Mem. at 7-10). We address each of these impairment in turn.

## 1.

Mr. Johnson argues that Dr. Kravarik's opinion demonstrates that his left shoulder injury is disabling, and the ALJ gave too little weight to Dr. Kravarik's opinion. However, Dr. Kravarik's opinions focused on Mr. Johnson's back and spine issues, not on his post-surgery shoulder problems. Dr. Kravarik does not discuss Mr. Johnson's left shoulder aside from noting difficulties with overhead and shoulder-level reaching on February 7, 2008 (R. 304). Mr. Johnson provides no other evidence in support of his argument that his left shoulder injury is disabling.

And, there is substantial evidence supporting the proposition that Mr. Johnson's left shoulder condition is not disabling. The record shows that Mr. Johnson's left shoulder healed well within 12 months of his alleged disability onset date. On September 9, 2007, two months after the surgery,

---

[5]We note that plaintiff makes a pass at a separate Step 3 argument by stating that Mr. Johnson's severe impairments "may" meet or equal a listing (Pl.'s Mem. at 2), which – if true – would require a finding of disability without the need for any RFC analysis. However, plaintiff never develops this point in any way, and we therefore deem it waived. *U.S. v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived").

Dr. Kravarik reported that Mr. Johnson was "much improved" with no pain (R. 251). Three days later, Dr. Kravarik himself noted further improvement, with increased range of motion in Mr. Johnson's left shoulder (*Id.*). Likewise, Dr. Nenaber reported on November 28, 2007 that Mr. Johnson's left shoulder was "healing well" (R. 287).

These improvements are corroborated by Dr. Komanduri, who found on December 27, 2007, that Mr. Johnson had made "decent progress" on his left shoulder, and Dr. Komanduri recommended just a "little more therapy," with the expectation of finishing in one month (R. 293). By February 5, 2008, Dr. Komanduri reported that Mr. Johnson's left shoulder had only a slightly diminished range of motion (R. 300). Finally, on February 25, 2008, Dr. Aquino affirmed Dr. Nenaber's assessment (R. 316).

Accordingly, we find that the ALJ's conclusion that Mr. Johnson's left shoulder was not a disabling impairment is supported by substantial evidence.

**2.**

Mr. Johnson argues that the ALJ should have found his right shoulder impairment disabling (Pl.'s Mem. at 11)). We disagree. Dr. Kravarik's opinion only minimally addresses Mr. Johnson's shoulder conditions (noting difficulties with left and right shoulder overhead and shoulder-level reaching), focusing primarily on his back and spine injuries (R. 304).

The other evidence regarding Mr. Johnson's right shoulder condition is similarly scant. Mr. Johnson first complained of pain in his right shoulder in July 2007 (after his alleged onset date), when he met with Dr. Komanduri to discuss surgery (R. 278). At that time, although Mr. Johnson had wished to "address" his right shoulder, Dr. Komanduri recommended – and Mr. Johnson agreed – to only proceed with surgery on his left shoulder, which caused him greater pain (*Id.*). They were

to reevaluate surgery on Mr. Johnson's right shoulder eight weeks after the left shoulder surgery. There is evidence from Dr. Malek's treatment records (R. 328, 330), and Mr. Johnson's testimony, that, in fact, he had surgery to repair his right shoulder. But, there is no medical report of right shoulder surgery in the record. Nor is there evidence of what, if any, limitations remained after that surgery.

Given the evidence in Dr. Malek's notes (not discussed by the ALJ) that Mr. Johnson had surgery on the right shoulder, we find it difficult to find substantial evidence for the ALJ's conclusion that Mr. Johnson received only "conservative treatment" for his right shoulder (R. 26). That said, we find no medical evidence of record to support the plaintiff's contention that the condition of his right shoulder after surgery and rehabilitation was disabling. At Step 3, the plaintiff bears the burden of proof. *Weatherbee*, 649 F.3d 569. Plaintiff, who was representing by counsel in the proceedings before the ALJ, failed to meet that burden with respect to his right shoulder condition.

**3.**

Next, we address the ALJ's decision to give Dr. Kravarik's opinion that Mr. Johnson had a disabling back injury "little weight," and her finding that Mr. Johnson's back and spine problems required only conservative treatment and were not disabling impairments. The ALJ noted that Dr. Malek found Mr. Johnson was not in acute distress and had "good relief of symptoms" of back pain with epidural steroid injections (R. 25). Further, Dr. Malek found that Mr. Johnson had a "positive response" to chiropractic treatment (*Id.*). The ALJ rejected Dr. Kravarik's opinion that Mr. Johnson had a lasting, disabling back impairment as not "supported by his own clinical findings and those

18

of other treating sources" (*Id.*). Mr. Johnson contends that the ALJ erred in this determination. For the following reasons, we agree.[6]

*First*, the opinions of Drs. Komanduri and Malek, Mr. Johnson's treating physicians, are not inconsistent with Dr. Kravarik's opinion concerning Mr. Johnson's back condition. Dr. Komanduri's opinions do not address Mr. Johnson's back or spine issues, but only Mr. Johnson's status after his left shoulder surgery. Thus, Dr. Komanduri's opinion was not inconsistent with Dr. Kravarik's opinion, and this was not an appropriate reason to give Dr. Kravarik's opinion little weight. *See Terry*, 580 F.3d at 477 (remanding, in part, because ALJ mischaracterized the record evidence as inconsistent with the claimant's testimony).

*Second*, Dr. Malek's opinions are not inconsistent with those of Dr. Kravarik. While the ALJ correctly noted that Dr. Malek found negative straight leg raise testing and unremarkable motor and sensory function (cited by ALJ at R. 25), the ALJ ignored Dr. Malek's diagnosis of chronic lumbar radiculopathy with "strong preponderance of back pain" (R. 318). An ALJ need not discuss every piece of evidence in the record; however, she "may not ignore an entire line of evidence that is contrary to the ruling." *Terry*, 580 F.3d at 477. Dr. Malek's diagnosis of chronic lumbar radiculopathy with "strong preponderance of back pain," is consistent with Dr. Kravarik's opinion, and calls into question the ALJ's decision to give Dr. Kravarik's opinion little weight.

---

[6] The parties spend much time quarreling about the proper weight the ALJ was required to give the opinion of Dr. Kravarik, a chiropractor. A chiropractor's opinion may not be used to establish impairment, though it can be used to show the severity of an impairment established by other evidence. 20 C.F.R. § 404.1513. Mr. Johnson argues that the ALJ rejected Dr. Kravarik's opinion because he is not an "acceptable medical source" as a chiropractor (Pl.'s Mem. at 8), and the Commissioner counters that the ALJ rejected the opinion because it was inconsistent with record medical evidence (Def.'s Resp. at 7). Both parties miss the mark: Dr. Kravarik's opinion should have been considered as evidence of the severity of Mr. Johnson's impairments.

In addition, the ALJ misstated the medical record by concluding that Mr. Johnson had "good relief of symptoms" from the epidural steroid injections Dr. Malek recommended and administered (R. 25). After Mr. Johnson's first and second epidural injections, Dr. Malek reported that Mr. Johnson had significant relief for one and one-half months, but then the pain returned (R. 330, 338). At that point, Dr. Malek recommended proceeding with the third injection before "considering any more intervention such as surgery" (R. 338). While the medical record does not contain any further notes from Dr. Malek after Mr. Johnson received his third injection on September 26, 2008, that may be the result of a lapse in Mr. Johnson's insurance (R. 44).

Thus, the notes in the record from Dr. Malek show that the epidurals provided Mr. Johnson with only limited pain relief. That is not inconsistent with Dr. Kravarik's opinion that Mr. Johnson has a serious spinal condition. "[T]he ALJ was too quick to read inconsistency into these statements. There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce. . . ." *Scott*, 647 F.3d at 739.

*Third*, the ALJ's determination that Dr. Kravarik's opinion contradicts itself (R. 25) lacks substantial evidence. To support that finding, the ALJ points to Dr. Kravarik's various findings that Mr. Johnson "had normal grip strength," could "ambulate without an assistive device," and had negative straight leg testing on September 10, 2007 (*Id.*). These statements, however, do not contradict Dr. Kravarik's opinion that Mr. Johnson would "always have problems due to extensive degeneration in [his] spine" and needed to alternate positions periodically for pain relief (R. 305). Thus, this was not an appropriate basis upon which to find Dr. Kravarik's opinion was deserving of little weight.

**B.**

Mr. Johnson also argues that the ALJ erred by not ordering a consultative mental examination for possible depression or a rheumatological examination because of the results of a 1999 blood test that only recently came to light (Pl.'s Mem. at 12-13). "The ALJ is not required to order such examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). "[T]he burden is on the claimant to introduce some objective evidence that further development of the record is required." *Poyck v. Astrue*, 414 F. App'x. 859, 861 (7th Cir. 2011).

Mr. Johnson has not met that burden here. There is no evidence in the record that the results of the 1999 blood test are indicative of any disability beyond that which Mr. Johnson already claimed. Mr. Johnson's attorney's argument at the hearing is not evidence. The ALJ held the record open for any additional rheumatological evidence, but Mr. Johnson did not provide any further documentation of such a condition.

Likewise, the ALJ was not required to order a mental consultative examination. There was only one mention of depression in the medical record: a brief note by Dr. Komanduri stating that Mr. Johnson did *not* suffer from depression because of his pain (R. 298). Mr. Johnson admits that he never sought therapy, medication, or other treatment for any alleged mental disability (Pl.'s Reply at 5). Where there is "scant evidence of [any] depression," an ALJ is not required to order additional tests. *See Mulligan v. Astrue*, 336 F. App'x. 571, 578 (7th Cir. 2009). Certainly, the ALJ was not required to do so here, where there was no evidence of depression.[7]

---

[7]Plaintiff's opening memorandum asserts that the ALJ erred in her determination of Mr. Johnson's credibility when testifying about his pain and limitations (Pl.'s Mem. at 10-12) The Commissioner defended the adequacy of that

# CONCLUSION

For the reasons set forth above, we grant Mr. Johnson's motion to remand (doc. # 12); we deny defendant's motion to affirm (doc. # 17). The case is remanded for further proceedings consistent with this Memorandum Opinion and Order.[8] This case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
United States Magistrate Judge

**Dated: August 2, 2012**

---

determination in his response (Def.'s Mem. at 8-10), and in reply, plaintiff elected not to address the credibility issue further.

In light of our decision to remand for the reasons stated above, we do not resolve this challenge to the credibility determination. We do note that the ALJ's comment that Mr. Johnson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective medical findings and evidence" (R. 23) bears strong resemblance to the style of formulaic statement the Seventh Circuit has repeatedly criticized. *See Smith v. Astrue*, 467 F. App'x 507, 511 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). On remand, if the ALJ maintains that same credibility finding, she must take care to explain precisely what medical findings and evidence she deems inconsistent with Mr. Johnson's testimony about his limitations.

[8]We deny without prejudice plaintiff's request for an award of attorneys' fees under the Equal Access to Justice Act ("EAJA") (Pl.'s Mem. at 13-14). Our determination that there is a lack of "substantial evidence" for the ALJ's determination does not automatically mean that there was a lack of "substantial justification" for the Commissioner's position, as the two standards differ. *U.S. v. Hallmark Const. Co.*, 200 F.3d 1076, 1080 (7th Cir. 2000).